# CASE NO. 24-525

In The

# United States Court Of Appeals
# For The Second Circuit

**NEW YORK STATE VEGETABLE GROWERS ASSOCIATION, INC.; A&J KIRBY FARMS, LLC; PORPIGLIA FARMS, INC.; CRIST BROS ORCHARDS, INC.; CAHOON FARMS, INC.; AND LYNN-ETTE & SONS, INC.,**

*Plaintiffs-Appellants,*

**v.**

**LETITIA JAMES, in her official capacity as Attorney General of New York; JOHN WIRENIUS, in his official capacity as Chairperson of the New York Public Employment Relations Board; SARAH G. COLEMAN, in her official capacity as the Deputy Chair of the New York Public Employment Relations Board and an Administrative Law Judge of New York Public Employment Relations Board; MARIAM MANICHAIKUL, in her official capacity as the Director of the New York Public Employment Relations Board's Office of Private Employment Practices & Representation and an Administrative Law Judge of New York Public Employment Relations Board,**

*Defendants-Appellees.*

Appeal
From the United States District Court
for the Western District of New York, Case No. 1:23-cv-01044-JLS

―――――――――――――――――――――

**PRINCIPAL BRIEF OF APPELLANTS**

―――――――――――――――――――――

Scott Allen, Jr.

**LIPPES MATHIAS LLP**
50 Fountain Plaza. Suite 1700
Buffalo, New York 14202
(716) 853-5100
sallen@lippes.com

Joshua Viau

Boris Gautier
**FISHER PHILLIPS LLP**
1230 Peachtree Street, NE, Suite 3300
Atlanta, Georgia 30309
(404) 231-1400
jviau@fisherphillips.com
bgautier@fisherphillips.com

*Counsel for Plaintiffs-Appellants*

## **RULE 26.1 DISCLOSURE STATEMENT**

Appellants New York State Vegetable Growers Association, Inc.; A&J Kirby Farms, LLC; Porpiglia Farms, Inc.; Crist Bros Orchards, Inc.; Cahoon Farms, Inc.; and Lynn-Ette & Sons, Inc., hereby state that Appellants have no parent corporations and that no publicly held corporation owns 10% or more of either Appellants' stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... i

INTRODUCTION .................................................................................... 1

JURISDICTIONAL STATEMENT .............................................................. 5

STATEMENT OF THE CASE...................................................................... 6

STANDARDS OF REVIEW ........................................................................ 8

SUMMARY OF THE ARGUMENT ........................................................... 9

ARGUMENT ........................................................................................... 10

   I.   Appellants have standing to challenge the entire FLFLPA statutory scheme. .................. 10

     A.   Because PERB's ongoing enforcement of the unconstitutional card-check and compelled unionization scheme directly threatens irreparable harm to agricultural employers, the challenge to those provisions satisfies Article III. ....................................... 12

     B.   Courts regularly allow employers to assert derivative constitutional claims when their employees' rights are threatened by state action. .................................................. 17

     C.   As the intended target of the challenged regulations, agricultural employers are presumed to have standing.................................................................................... 19

     D.   Employers have standing to challenge the constitutionality of PERB's administrative process........................................................................................................ 20

     E.   The prudential third-party standing doctrine does not apply...................................... 21

   II.   Appellants appropriately assert pre-enforcement challenge SERA's compulsory arbitration scheme. ...................................................................................... 26

   III.   The district court's order cannot be affirmed because the court failed to articulate the basis for its denial of injunctive relief on multiple claims. ....................................... 31

   IV.   Appellants are likely to succeed on the merits of their due process and equal protection claims. ........................................................................................................ 35

     A.   The State deprives private sector agricultural employers of numerous protected interests without sufficient process. ...................................................................... 36

     B.   The district court misapplied the procedural due process framework and failed to address the actual due process claims set forth in the Complaint........................................ 41

     C.   The structure of PERB does not comport with due process. ....................................... 42

     D.   The compulsory binding "arbitration" regime offends fundamental constitutional rights.. ................................................................................................ 44

   V.   Appellants have demonstrated irreparable harm and likelihood of success on the merits of their H-2A preemption claim…………………………………………………………….52

VI.   Remand is not necessary because the Court has full discretion to grant injunctive relief based upon the district court record. ........................................................................ 55

CONCLUSION ........................................................................................................ 56

CERTIFICATE OF COMPLIANCE ......................................................................... 57

PROOF OF SERVICE .............................................................................................. 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

303 Creative LLC v. Elenis,
   6 F.4th 1160 (10th Cir. 2021) ...........................................................................30

303 Creative LLC v. Elenis,
   600 U.S. 570 (2023)..................................................................................29, 30

A.H. v. French,
   985 F.3d 165 (2d Cir. 2021)........................................................................9, 35

Alleyne v. State,
   516 F.3d 96 (2d Cir. 2008)..............................................................................31

American Express Financial Advisors v. Thorley,
   147 F.3d 229 (2d Cir. 1998)........................................................................8, 32

American Iron & Steel Institute v. Occupational Safety & Health Administration,
   182 F.3d 1261 (11th Cir. 1999) .......................................................................21

Ashcroft v. American Civil Liberties Union,
   542 U.S. 656 (2004)........................................................................................31

Axon Enter. v. Fed. Trade Comm'n,
   143 S. Ct. 890 (2023).................................................................................20, 21

Babbitt v. United Farm Workers,
   442 U.S. 289 (1979).................................................................................45, 46

Barrows v. Jackson,
   346 U.S. 249 (1953)........................................................................................22

Bayscene Resident Negotiators v. Bayscene Mobilehome Park,
   15 Cal.App.4th 119 (1993) ..............................................................................46

Bohnak v. Marsh & McLennan Companies, Inc.,
   79 F.4th 276 (2d Cir. 2023) ............................................................................14

Boy Scouts of America v. Dale,
   530 U.S. 640 (2000)........................................................................................26

Cayuga Nation v. Tanner,
   824 F.3d 321 (2d Cir. 2016)............................................................................14

Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay,
    868 F.3d 104 (2d Cir. 2017)........................................................................13

Charette v. Town of Oyster Bay,
    159 F.3d 749 (2d Cir. 1998)........................................................................31

Chernin v. Lyng,
    874 F.2d 501 (8th Cir. 1989) .....................................................................36

Hsu ex rel. Chin-Ching Hsu v. Roslyn Union Free School District No. 3,
    85 F.3d 839 (2d Cir. 1996)......................................................................8, 35

Clark v. City of Lakewood,
    259 F.3d 996 (9th Cir. 2001) .....................................................................19

Cleveland Board of Education v. Loudermill,
    470 U.S. 532 (1985)....................................................................................38

CompassCare v. Cuomo,
    465 F. Supp. 3d 122 (N.D.N.Y. 2020) ......................................................10

Craig v. Boren,
    429 U.S. 190 (1976)....................................................................................22

Craigmiles v. Giles,
    312 F.3d 220 (6th Cir. 2002) .....................................................................52

Doran v. Salem Inn, Inc.,
    422 U.S. 922 (1975)....................................................................................19

Dorchy v. Kansas,
    264 U.S. 286 (1924)....................................................................................44

NLRB v. Jones & Laughlin Steel Corp.,
    301 U.S. 1 (1937)..................................................................................44, 50

Eisenstadt v. Baird,
    405 U.S. 438 (1972)..............................................................................21, 55

Eyewonder v. Abraham,
    293 F. App'x 818 (2d Cir. 2008) ...............................................................34

Fed. Election Comm'n v. Cruz,
    596 U.S. 289 (2022)....................................................................................11

Gajon Bar Grill, Inc. v. Kelly,
    508 F.2d 1317 (2d Cir. 1974).....................................................................17

Gibson v. Berryhill,
    411 U.S. 564 (1973)..........................................................................39

Goldberg v. Kelly,
    397 U.S. 254 (1970)..........................................................................39

Hang On, Inc. v. City of Arlington,
    65 F.3d 1248 (5th Cir. 1995) ...........................................................19

Holmes v. N.Y. City Hous. Auth.,
    398 F.2d 262 (2d Cir. 1968)..............................................................47

Horne v. Polk,
    242 Ariz. 226 (2017)..........................................................................43

Hutto v. Finney,
    437 U.S. 678 (1978)..........................................................................55

Janus v. AFSCME,
    138 S. Ct. 2448 (2018).............................................................15, 50

Lazy Ranch Ltd. v. Behrens,
    546 F.3d 580 (9th Cir. 2008)............................................................51

Locurto v. Safir,
    264 F.3d 154 (2d Cir. 2001)..............................................................25

Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992)..........................................................................19

McLane Co. v. Equal Emp't Opportunity Comm'n,
    137 S. Ct. 1159 (2017)........................................................................8

MedImmune, Inc. v. Genentech, Inc.,
    549 U.S. 118 (2007)..........................................................................30

Memphis Light, Gas Water Div. v. Craft,
    436 U.S. 1 (1978)..............................................................................38

Mengel v. Nashville Paper Prod,
    221 F.2d 644 (6th Cir. 1955) ...........................................................47

Merrifield v. Lockyer,
    547 F.3d 978 (2008)..........................................................................52

Merrill Lynch Inv. Managers v. Optibase, Ltd.,
    337 F.3d 125 (2d Cir.2003)...............................................................26

Mgmt., Inc. v. Equal Emp. Opportunity Comm'n,
   70 F.4th 914 (5th Cir. 2023) ......................................................30, 52, 53

NAACP v. Town of New Haven,
   70 F.3d 219 (2d Cir. 1995).................................................................5, 31

Nat'l Lifeline Ass'n v. Batjer,
   No. 21-15969, 2023 WL 1281676 (9th Cir. Jan. 31, 2023)....................19

National Educ. Ass'n of R.I. v. Garrahy,
   598 F. Supp. 1374 (D.R.I. 1984)...........................................................17

New York State Vegetable Growers Ass'n, Inc. v. James,
   No. 23-CV-1044 (JLS), 2024 WL 665978 (W.D.N.Y. Feb. 16, 2024) ....................7

Nicholas v. Pennsylvania State University,
   227 F.3d 133 (3d Cir. 2000)..................................................................36

Nielsen Consumer LLC v. The NPD Grp.,
   No. 22-1206 (2d Cir. Oct. 14, 2022)......................................................32

Pierce v. Society of Sisters,
   268 U.S. 510 (1925)..............................................................................22

Planned Parenthood Great Nw. v. Labrador,
   1:23-cv-00142-BLW (D. Idaho July 31, 2023) .....................................30

Polymer Technology Corp. v. Mimran,
   975 F.2d 58 (2d Cir. 1992)......................................................................9

Powers v. Ohio,
   499 U.S. 400 (1991)..............................................................................25

Rameses, Inc. v. County of Orange,
   481 F. Supp. 2d 1305 (M.D. Fla. 2007).................................................18

Reed v. Goertz,
   598 U.S. 230 (2023)..............................................................................36

Rice v. Vill. of Johnstown,
   30 F.4th 584 (6th Cir. 2022) .................................................................36

Roberts v. U.S. Jaycees,
   468 U.S. 609 (1984)..............................................................................24

Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
   490 U.S. 477 (1989)..............................................................................45

San Filippo v. United Bro. of Carpenters,
   525 F.2d 508 (2d Cir. 1975)............................................................55

Secretary of State of Md. v. J. H. Munson Co.,
   467 U.S. 947 (1984)..............................................................21, 22

Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.,
   2019 WL 1349527 (S.D.N.Y. Mar. 26, 2019) ........................................48

St. Joseph Abbey v. Castille,
   712 F.3d 215 (5th Cir. 2013) ........................................................51

Starr Indem. & Liab. Co. v. G&G Underwriters,
   19-cv-7835 (AJN), (S.D.N.Y. Aug. 9, 2021)..........................................48

Superintendent v. Hill,
   472 U.S. 445 (1985)..................................................................38

Tweed-New Haven Airport Auth. v. Tong,
   930 F.3d 65 (2d Cir. 2019)......................................................12, 27

UBS Sec. LLC v. Voegeli,
   684 F. Supp. 2d 351 (S.D.N.Y. 2010), aff'd, 405 F. App'x 550 (2d Cir. 2011).....................10

United Farm Workers Nat. Union v. Babbitt,
   449 F. Supp. 449 (D. Ariz. 1978), rev'd, 442 U.S. 289 (1979) ...............................45

United States v. James Daniel Good Real Property,
   510 U.S. 43 (1993)...................................................................38

Village of Willowbrook v. Olech,
   528 U.S. 562 (2000)..................................................................49

Virginia v. Am. Booksellers Ass'n, Inc.,
   484 U.S. 383 (1988)..................................................................11

Vitagliano v. Cnty. of Westchester,
   71 F.4th 130 (2d Cir. 2023) .........................................................29

Wall & Ochs, Inc. v. Grasso,
   469 F. Supp. 1088 (D. Conn. 1979)....................................................18

Warrior Met Coal Mining v. United Mine Workers of Am.,
   2022 WL 656118 (11th Cir. Mar. 4, 2022).............................................48

Waters v. Churchill,
   511 U.S. 661 (1994) (plurality opinion) ..............................................38

White v. Roughton,
    530 F.2d 750 (7th Cir. 1976) ................................................................47

Withrow v. Larkin,
    421 U.S. 35 (1975) ..........................................................................43

Wolff Packing Co. v. Indus. Court,
    262 U.S. 522 (1923) ........................................................................43

Wolff Packing Co. v. Indus. Court,
    267 U.S. 552 (1925) ........................................................................44

Wolff v. McDonnell,
    418 U.S. 539 (1974) ........................................................................38

**Statutes and Rules**

28 U.S.C. § 1292(a)(1) ...........................................................................6

28 U.S.C. §§ 1331 ..................................................................................5

42 U.S.C. § 1983 ....................................................................................5

SERA § 700 ............................................................................................3

SERA §§ 701(2)(b) ................................................................................2

SERA § 702-b ............................................................................. *passim*

SERA § 704(6) ......................................................................................14

SERA § 704-b(2)(c) ...............................................................................7

SERA § 705(1) ......................................................................................39

SERA § 705(1-a) ...................................................................................13

SERA § 706 ..........................................................................................37

SERA § 709 ...............................................................................1, 20, 34

CPLR Article 75 ...................................................................................48

Fed. R. App. P. 4(a) ...............................................................................6

Fed. R. Civ. P. 52(a)(2) .....................................................................5, 34

Local Rule 7(a)(3) ..................................................................................7

PERB Rule § 263 ..................................................................................................3

PERB Rule § 263.29 ...........................................................................................37

**Other Authorities**

David A. Schwarz, *Compelled Consent: Wolff Packing and the Constitutionality
of Compulsory Arbitration*, N.Y.U, Journal of Law & Liberty, Vol. 12:24, 15-
123 (2018), available at: https://tinyurl.com/2k8ptsmv .........................................45

Philip Rosen and Richard Greenberg, *Constitutional Viability of the Employee Free Choice
Acts's Interest Arbitration Provision* , Hofstra Labor and Employment L. J.: Vol. 26: Iss.
1, Article 13 (2008), available at:
http://scholarlycommons.law.hofstra.edu/hlelj/vol26/iss1/13 .................................50

# INTRODUCTION

As a result of the 2020 Farm Laborers Fair Labor Practice Act ("FLFLPA") amendments to the State Employment Relations Act ("SERA") (collectively, the "Act"), New York farms must now answer to a State agency—the Public Employment Relations Board ("PERB" or "Agency")—that threatens to assert unprecedented power to, *inter alia*, 1) require farms to recognize and bargain with a private labor union as the "exclusive representative" of their workplace even when the workers disavow the union; 2) subject farms to burdensome administrative proceedings without due process; 3) compel farms to engage in a nonconsensual binding "arbitration" whenever requested by the union; 4)  instruct a State-designated "arbitrator" to unilaterally decree enforceable labor regulations individualized to each farm; 6) induce farms to violate immigration law and breach their existing work contracts mandated by federal H-2A regulations; and 7) prosecute unfair labor charges against farms that assert their rights to deny union access to their private property. Any conduct deemed to "resist, prevent, impede, or interfere" with this Agency can result in criminal prosecution and imprisonment. See SERA § 709. The State's patently unconstitutional policies and practices not only offend traditional notions of fairness, labor rights, and federalism, but also threaten to disrupt New York's agricultural industry.

1

These claims are not hypothetical. The State continues to subject Appellants A&J Kirby Farms, Porpiglia Farms, Crist Bros Orchards, Lynn-Ette & Sons, and Cahoon Farms (collectively, the "Farm Plaintiffs") to ongoing enforcement actions—ripe controversies that will continue to threaten the farms' livelihoods absent this Court's intervention. The extensive deprivations of the Farm Plaintiffs' constitutional rights without due process illustrate how the text of the FLFLPA is just the tip of the proverbial constitutional violation iceberg. The State has repeatedly denied farms the opportunity to be heard or present evidence before issuing binding orders that drastically alter their operations and have long-lasting impacts on their current and future employment relationships. Along the way, the Agency has impermissibly invented new legal standards out of whole cloth—standards, rules, and obligations that have been arbitrarily enforced against the private sector agricultural employers with no predictability or consistency. Even worse, the Agency begins enforcing its unilateral orders without providing any opportunity for review by a neutral decisionmaker.

Faced with these ongoing threats to their constitutional rights, Appellants filed a 100-page Verified Complaint in support of their request for a limited prohibitory injunction to halt enforcement of the following five statutory provisions: SERA

§§ 701(2)(b); 701(3)(c); 702-b; 704-b; and 705(1-a).[1] The Complaint thoroughly lays out the structural flaws in the statutory scheme, as well as the history of PERB's administrative proceedings against the Farm Plaintiffs. The district court record consisted of nearly 4,000 pages documenting how the State's unconstitutional practices are endemic to the Act and the PERB regulatory regime.

Against this backdrop, the district court's conclusory denial of nearly all of Appellants' requested injunctive relief cannot stand. In a 17-page order largely bereft of citations to authority or the record, the lower court overlooked established justiciability principles, misapplied the preliminary injunction factors, ignored binding precedent, and wholly failed to address the majority of Appellants' claims and legal arguments. The merits of Appellants' constitutional claims remain effectively unaddressed. In fact, given that no other jurisdiction in the history of American labor law has ever enacted any framework resembling New York's targeted compelled unionization scheme, this case presents multiple novel issues of first impression. Affirming the district court's decision would allow the State to continue wading into uncharted constitutional waters without judicial review.

---

[1] The relevant statutory provisions are in Chapter 31, Article 20, Sections 700–718 of the New York Labor Law Code and available here: https://perb.ny.gov/new-york-state-employment-relations-act/. Consistent with the Complaint, Appellants cite to these provisions as SERA § 700, *et al*. PERB has enacted regulations pursuant to this statute. <u>See</u> N.Y. Comp. Codes R. & Regs. tit. 12, §§ 263.1–263.123. Appellants cite to these regulations as PERB Rule § 263, *et al*. These regulations are available here: https://perb.ny.gov/sera-rule/.

Absent intervention by this Court, New York's agricultural industry will suffer irreparable harm. For the Farm Plaintiffs, the imminent harm will be disastrous. In the three months since the district court's decision, the State has resumed its aggressive prosecution of these family farms. Some of the threatened conduct asserted in the Complaint—including referrals to binding compulsory arbitration—has come to fruition, and time is of the essence.

This Court should vacate the district court's decision and enjoin Appellees from engaging in any further enforcement actions against private sector agricultural employers. This appeal presents purely legal issues and a clean record of largely uncontested facts. Appellants' submissions to the court below thoroughly sets forth numerous independent grounds in support for their request for preliminary injunctive relief. See District. Ct. Dkt 1; Dkt. 2; Dkt. 94. The district court's order, however, summarily adopted many of the legal conclusions advanced by Appellees in their Response Brief without addressing the legal authority cited in Appellants' Reply. See Dkt. 94.

Granting Appellants' request for injunctive relief would restore the status quo as it existed before the State started enforcing this constitutionally flawed regulatory scheme two years ago. The narrow injunction would not prevent the Legislature or PERB from correcting these many errors and enacting presumably legal regulations governing collective bargaining for farm laborers. Granting the preliminary

injunction would not disrupt any longstanding, generally applicable labor laws. SERA would continue to apply to public sector employment and non-agricultural employers that are not subject to the unique unconstitutional requirements targeted at farms and farmworkers. Appellants only seek to enjoin the State's unjustifiable intrusion on private sector agricultural employers and employees.

At minimum, the Court must reverse and remand the case to the district court with instructions to fulfill its duty of exercising jurisdiction over the merits of the numerous issues presented. The district court's failure to articulate its findings and reasoning frustrates appellate review and does not comply with the Federal Rules. See Fed. R. Civ. P. 52(a)(2) ("In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action."); NAACP v. Town of New Haven, 70 F.3d 219, 224 (2d Cir. 1995) (noting that the "principal purpose" of Rule 52(a) is "is to allow appellate review of the district court's decision" and vacating an order denying injunctive relief because the district court "made no findings of fact or conclusions of law with respect to appellants' likelihood of success on the merits.").

## JURISDICTIONAL STATEMENT

The district court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, as well as 42 U.S.C. § 1983, because Plaintiffs-Appellants' claims arise under the United States Constitution and federal statutes,

and this action presents questions of federal law. This Court has jurisdiction over this appeal from the district court's denial of Appellants' Motion for Preliminary Injunction pursuant to 28 U.S.C. § 1292(a)(1). This appeal of the district court's February 21, 2024 order was timely filed pursuant to Fed. R. App. P. 4(a). Plaintiffs-Appellants filed their Notice of Appeal on March, 12, 2024.

## STATEMENT OF THE CASE

Plaintiffs-Appellants brought this action against officials of the State of New York and the New York Public Employment Relations Board ("PERB") to enjoin enforcement of the 2020 amendments to the State Employment Relations Act ("SERA"), which were enacted into law as part of the Farm Laborers Fair Labor Practices Act ("FLFLPA"). See New York Labor Law Code, Chapter 31, Article 20, Sections 700–718. Plaintiffs allege that SERA and the FLFLPA, as well as PERB's enforcement activities, practices, and procedures, violate various provisions of federal law and the U.S. Constitution, including the First Amendment, Fifth Amendment, Fourteenth Amendment, and Supremacy Clause. On October 3, 2024, concurrently with the Complaint, Plaintiffs moved for a temporary restraining order (TRO) and preliminary injunctive relief based upon each of the causes of action in the Complaint. The case was assigned to Judge John L. Sinatra, Jr. in the Buffalo Division of the Western District of New York.

After an initial conference with Judge Sinatra on October 4, 2024, the Parties agreed to a stipulated stay in lieu of an expedited TRO hearing. See Dkt. 23.[2] Through this Stipulation, Defendants agreed to halt all prosecutions and enforcement actions against private sector agricultural employers until two weeks after the preliminary injunction hearing. Defendants filed their Response in Opposition to Plaintiffs' Motion for Preliminary Injunction on January 12, 2024. Dkt. 35.[3] With the district court's permission, various amici submitted briefs both in support and in opposition to Plaintiffs' Motion. See Dkts. 76-1, 78-2, 83, 99, 102-2. The United States also submitted a Statement of Interest. See Dkt. 79.

On February 21, 2024, the Parties appeared for the preliminary injunction hearing. That same day, the district court issued its order granting in part and denying in part Plaintiffs' Motion for Preliminary Injunction. New York State Vegetable Growers Ass'n, Inc. v. James, No. 23-CV-1044 (JLS), 2024 WL 1161115 (W.D.N.Y. Feb. 21, 2024). The court enjoined enforcement of SERA § 704-b(2)(c), which prohibits agricultural employers from "discourage[ing] union organization" in

---

[2] Unless otherwise stated, Appellants cite to the record on appeal by district court docket number and the file-stamped page number. The parties have stipulated to a deferred appendix.

[3] Appellees also submitted voluminous Declarations from PERB officials John Wirenius, Mariam Manichaikul, and Sarah Coleman. Appellants moved to strike the contents of the Declarations from the evidentiary record because they included lengthy legal arguments and generalized opinions not based on personal knowledge in violation of W.D.N.Y. Local Rule 7(a)(3). See Dkt. 92-1. The court declined to strike the Declarations but ruled that it would that disregard the portions that "are improper or lack evidentiary value." New York State Vegetable Growers Ass'n, Inc. v. James, No. 23-CV-1044 (JLS), 2024 WL 665978, at *1 (W.D.N.Y. Feb. 16, 2024).

contravention of the First Amendment. Defendants did not appeal that ruling and the injunction remains in effect. The court denied all other requested injunctive relief.

## STANDARDS OF REVIEW

Although the abuse of discretion standard generally governs review of preliminary injunction orders, "questions of law decided in connection with requests for preliminary injunctions, however, receive the same de novo review that is appropriate for issues of law generally." American Express Financial Advisors v. Thorley, 147 F.3d 229, 231 (2d Cir. 1998). Put differently, the abuse of discretion standard "does not shelter a district court" that misapplies the law because "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law." McLane Co. v. Equal Emp't Opportunity Comm'n, 137 S. Ct. 1159, 1168 n.3 (2017) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 403, 405 (1990)).

Moreover, as this Court has explained, "deferential review" is not "justified" when, as here, "the district court ruling resembles a final decision" that effectively will not "allow[] room for a different ultimate outcome." Hsu ex rel. Chin-Ching Hsu v. Roslyn Union Free School District No. 3, 85 F.3d 839, 852–53 (2d Cir. 1996) (holding that "review of the district court's denial of a preliminary injunction is plenary" where "the district court's resolution of the case hinged" on "how the law should be applied"). The district court here did not make credibility

determinations and did not conduct an evidentiary hearing. The court's denial of injunctive relief was based upon legal conclusions. Appellants are therefore entitled to de novo review.

## **SUMMARY OF THE ARGUMENT**

The district court erred in several respects and should be reversed. First, the court's standing and ripeness analysis does not comport with the black letter law principles that a party targeted by an unconstitutional statutory scheme has standing to challenge all relevant parts of the statute, even on a pre-enforcement basis. Second, because "[t]he district court overlooked some relevant evidence in the record, and construed several theories of liability too narrowly," the "court's conclusion that [plaintiffs] failed to establish either the likelihood of success on the merits or sufficiently serious questions going to the merits cannot stand." Polymer Technology Corp. v. Mimran, 975 F.2d 58, 64 (2d Cir. 1992) (instructing the district court on remand to "consider all relevant evidence in light of the legal theories discussed"). Third, the voluminous record and the evidence submitted in support of the Verified Complaint allow this Court to conclude that Appellants have a likelihood of success on the merits of their constitutional claims.

The remaining preliminary injunction factors are also satisfied because "[t]he denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the violation persists for 'minimal periods' of time." A.H. v. French, 985 F.3d

9

165, 184 (2d Cir. 2021) (citation omitted). <u>See also</u> <u>CompassCare v. Cuomo</u>, 465 F. Supp. 3d 122, 159 (N.D.N.Y. 2020) ("the balance of the equities favors granting the injunction, since the Plaintiffs face a deprivation of their constitutional rights."); <u>Perry St. Software, Inc. v. Jedi Techs.</u>, Inc., No. 20-CV-04539 (CM), 2020 WL 6064158, at *7 (S.D.N.Y. Oct. 14, 2020) ("enforcing a private dispute resolution to which a party has not agreed is never in the public interest."); <u>UBS Sec. LLC v. Voegeli</u>, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010), <u>aff'd,</u> 405 F. App'x 550 (2d Cir. 2011) ("It is beyond dispute that irreparable harm would result" if a party that never "agreed to arbitration" were "compelled" to resolve a dispute in arbitration).

The Court should vacate the lower court's decision and enter a preliminary injunction to halt enforcement of the Act against private sector agricultural employers and halt the State's enforcement actions against Appellants.

## **ARGUMENT**

### I. **Appellants have standing to challenge the entire FLFLPA statutory scheme.**

By compartmentalizing some of Appellants' allegations into a bucket of non-justiciable "farmworker rights-based claims," the district court overlooked the Act's structural targeting of agricultural employers, as well as the actual economic harm faced by farms as a result of the State's enforcement of the Act. Order, p. 5.[4] As

---

[4] Appellants cite to the district court's order (Dkt. 116) as "Order" followed by the page number and the Verified Complaint (Dkt. 1) as "Comp." followed by the paragraph number or exhibit ("Ex.") number and page.

Appellants set forth in their briefs below—and as the district court neglects to mention in its order—the State's enforcement of card-check and compelled unionization directly violates the constitutional rights of *employers*. Even if some of the potential harm to farms could be characterized as "economic, not speech related," Appellants may bring their First Amendment claims. Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 392–93 (1988). Here, just as in Am. Booksellers, "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." Id. (holding that bookstores who "alleged an infringement of the First Amendment rights of bookbuyers" had standing).

The so-called third party standing doctrine invoked by the court to deny Appellants a ruling on the merits of their compelled unionization claims does not apply under these circumstances because courts have a duty to enjoin government action that threatens freedom of speech of any party—especially here, where employers suffer derivative harm, farms and farmworkers have a mutual interest in preserving their rights, and the State has denied farmworkers all practical avenues for relief.

When adjudicating standing, the Court must assume that the unconstitutionality of the statutory provisions challenged by Appellants. Fed. Election Comm'n v. Cruz, 596 U.S. 289, 298 (2022) ("For standing purposes, . . .

we must assume that the [challenged regulation] unconstitutionally burdens speech.").  The only question is whether, assuming all facts in the Complaint as true, any of the Appellants have alleged "a sufficient nexus to the challenged action in the form of a personal stake in the litigation so that the case or controversy requirements of Article III are met." <u>Tweed-New Haven Airport Auth. v. Tong</u>, 930 F.3d 65, 71-72 (2d Cir. 2019). The answer is a resounding yes.

### A. Because PERB's ongoing enforcement of the unconstitutional card-check and compelled unionization scheme directly threatens irreparable harm to agricultural employers, the challenge to those provisions satisfies Article III.

A straightforward application of the injury, causation, and redressability requirements confirm that Appellants—five family farms and an agriculture association—have Article III standing to challenge all aspects of the Act and its applications. <u>See</u> <u>Susan B. Anthony List v. Driehaus</u>, 573 U .S. 149, 157-58 (2014) (distilling the elements of standing).

First, the farms face economic and constitutional injuries, including monetary penalties, costs of compliance, and increased labor costs (direct pocketbook injuries); compulsory association with—and subsidization of—labor unions (First Amendment); and imposition of targeted farm-by-farm regulations without due process (Fourteenth Amendment). The district court's standing analysis ignores the documented history of actual and threatened enforcement against Appellants, including the Farm Plaintiffs **(1)** being ordered to bargain with union representatives

(Comp. ¶ ¶ 147–58, 163, 185, 187); **(2)** being ordered to change their operations, production methods, and the terms of their employment contracts by having to arbitrarily divide their workforce pursuant to the union's request (Comp., ¶ 151); **(3)** having to attend State-directed mediation with labor unions (Comp., ¶ ¶ 164, 188, 207, 247); and **(4)** having to expend valuable time and limited resources responding to multiple frivolous charges that the State has refused to dismiss (Comp. ¶ ¶ 118, 119, 130, 132, 166, 182, 168–72). See Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 110 (2d Cir. 2017) (holding that where a plaintiff alleges a need to "divert resources from other of its activities to combat the effects of the Ordinance," it "has suffered an injury that has been repeatedly held to be independently sufficient").

Second, the State directly causes these injuries by commencing unconstitutional administrative proceedings against agricultural employers and granting private labor unions unique status as the "exclusive representative" of a farm's employees. The Act's card-check certification scheme—a union selection process that had never been applied to private sector employers before New York's passage of the FLFLPA—provides that a union "will be certified without an election if a majority of the employees within the unit have executed a showing dues deductions authorizations." SERA § 705(1-a). Through PERB's refusal to permit decertification or revocation of union membership—which guarantees the union's

certified representative status in perpetuity—the corresponding violations of employers' constitutional rights continue unchecked. See Comp., Ex. 2, p. 3, 11 (Agency confirming that "The SERA and the FLFLPA do not provide for withdrawal or revocation of cards" and "the statutes do not expressly provide for decertification."). Enforcement of the remaining parts of the statute is premised on these card-check certification rules. See, e.g., SERA § 702-b(1) (providing that the compulsory arbitration process only applies when the farm is subject to a "certification"); SERA § 704(6) (making it unlawful for an employer to refuse to bargain with a union certified as "the representatives of employees"). See also Bohnak v. Marsh & McLennan Companies, Inc., 79 F.4th 276, 283 (2d Cir. 2023) (confirming that "alleged injuries arising from the risk of future harm are concrete").

Finally, the requested injunction will redress Appellants' injuries by preventing the State from relying on this compelled unionization of farmworkers to violate employers' First and Fourteenth Amendment rights to freedom of association, speech, due process, and equal protection. See Cayuga Nation v. Tanner, 824 F.3d 321, 332-33 (2d Cir. 2016) ("a favorable decision may redress the injury alleged in the complaint by preventing the Village from enforcing the Ordinance against the plaintiffs, which is all that is required to establish Article III standing.").

The district court, however, held that agricultural employers targeted by State enforcement actions lacked standing to challenge any aspect of the card-check

scheme and its accompanying regulations. <u>See</u> Order, pp. 4-5 (holding that Appellants lacked standing to assert 1) "a due process and equal protection claim related to the card check process;" 2) "a First Amendment/compelled speech claim based on *Janus*;" 3) "a First Amendment claim based on the absence of a decertification procedure and a right to refrain;" and 4) "an equal protection claim based on disparate treatment of agricultural employers and employees").[5] The court summarily accepted Appellees' arguments that those statutory procedures only involve "the rights of farmworkers." Order, p.4.

Under the FLFLPA, however, each incidental violation of farmworkers' constitutional rights serves as a prerequisite to the State ultimately inflicting direct harm on employers. The card-check and mandatory unionization aspects of the scheme sit at the bottom of an unwieldy—and ultimately unconstitutional—house of cards, upon which the State stacks its certification decisions, bargaining orders, and unfair labor practice charges.

Clearly, "[d]esignating a union as the employees' exclusive representative substantially restricts the rights of individual employees." <u>Janus v. AFSCME</u>, 138

---

[5] The district court characterized this equal protection claim as "alleged on the employees' behalf" even though the cited pages of Complaint (p. 86-95) allege that *employers* are arbitrarily subject to disparate treatment. <u>See</u> Comp. ¶ 384 ("An employer is only prohibited from *encouraging* company unions; and an employer is only prohibited from *discouraging* labor organizations."); ¶ 387 ("only agricultural employers and farm laborers are subject to the FLFLPA's compulsory unionization provisions"). The fact that the Act's targeting of agricultural employers also necessarily leads to disparate treatment of their employees does not mean that Appellants' entire equal protection claim is brought "on the employees' behalf."

S. Ct. 2448, 2460 (2018). But under the FLFLPA, this designation—the preordained outcome of the Act's card-check process—also directly affects the interests of *employers* because, at the same time that the Agency designates a union as the certified representative of a farm's employees, the Agency orders the farm to bargain with that union. Comp., ¶¶ 147–63, 185-87, 205-09; Comp., Ex. 13, 21.[6] If an agricultural employer refuses to bargain after certification attaches, the employer commits an unfair labor practice, and the State may enforce various penalties and sanctions against the employer. See SERA § 704; 706.

After building this foundation, PERB places the final card on top of the irreparable harm pyramid: compulsory "impasse arbitration," the statute's euphemism for a State-appointed "arbitrator" issuing a binding decree that will govern every aspect of the farm's operations, including "wages, hours and conditions of employment." SERA § 702-b. But if the Act's compelled unionization and card-check regime cannot survive constitutional scrutiny—as pled in the Complaint and accepted as true for standing purposes—then the proverbial house of cards tumbles, and the State cannot constitutionally proceed with enforcement actions against farms until or unless the Act is amended to cure these deficiencies.

---

[6] Indeed, the State effectuates each violation of farmworkers' rights through orders expressly directed at *employers*, thereby compelling the employer to participate in a de facto conspiracy with PERB officials to deprive farmworkers of their fundamental First Amendment freedoms of speech and association. Farmworkers are not even parties to the proceedings.

Any Agency orders issued without farmworkers' having a guaranteed right to refrain from union activity—including all the certification orders issued to the Farm Plaintiffs—would necessarily be *void ab initio*. These orders leave no doubt that the State's infringement on farmworkers' First Amendment rights is inextricably intertwined with the enforcement of the Act against Appellants. See, e.g., UFW v. Porpiglia, CU-6695, 56 PERB ¶ 4406, 2023 WL 3963573 (April 12, 2023); UFW v. Kirby Farms, CU-6696, 56 PERB ¶ 4402, 2023 WL 3071143 (March 16, 2023).

### B. Courts regularly allow employers to assert derivative constitutional claims when their employees' rights are threatened by state action.

This Court has held that "a party facing economic injury as a result of the deprivation of the rights of others has standing to raise the constitutional issue." Gajon Bar Grill, Inc. v. Kelly, 508 F.2d 1317, 1322 n.9 (2d Cir. 1974) (upholding standing of corporation to assert First Amendment rights of its employees and patrons). "Where, as here, the claimant alleges a 'derivative injury' as a result of the deprivation of the third party's rights, it is settled that he or she may sue." National Educ. Ass'n of R.I. v. Garrahy, 598 F. Supp. 1374, 1380 (D.R.I. 1984). Otherwise, "if the party whose rights are asserted cannot or does not challenge the provision, then the derivately-injured party is left without a means of redress." Id. (citing L. Tribe, AMERICAN CONSTITUTIONAL LAW, § 3–27, at 108).

This well-established "derivative injury" rule arises in the employment context because employees and employers are not truly "third parties" to one

another. Rather, the two are co-parties to a mutually beneficial relationship. Due to these intertwined interests, the government often seeks to regulate the conduct or speech of an industry's rank-and-file workers as a means of targeting the industry as a whole. When the government infringes on the rights of a class of employees in a way that economically harms their employers, the employers have standing to redress that economic harm by challenging the constitutionality of the government's actions to the same extent—and on the same grounds—as the employee. See, e.g., Wall & Ochs, Inc. v. Grasso, 469 F. Supp. 1088, 1091 (D. Conn. 1979) ("Plaintiff, rather, asserts that the denial of the rights of its employees causes it direct injury. In particular, plaintiff claims that the actions of the Commission adversely affect its business . . . As such, plaintiff has satisfied the requirements of standing."); Rameses, Inc. v. County of Orange, 481 F. Supp. 2d 1305, 1314 (M.D. Fla. 2007) (holding that business had standing to challenge regulation of employee conduct because the business "may be criminally liable and may have its license suspended or revoked if a worker violates the provisions").

By way of analogy, federal courts do not question the ability of adult entertainment businesses to challenge ordinances that prohibit nudity—even though, technically, such laws only directly affect the employees' freedom of speech. As courts recognize, "[a]lthough the financial impact of an adult entertainment regulation upon a plaintiff has only limited value in determining whether the

18

regulation actually violates the First Amendment, that impact is relevant and sufficient to satisfy Article III's injury-in-fact requirement and allow a plaintiff to proceed with his constitutional challenge to the regulation." Clark v. City of Lakewood, 259 F.3d 996, 1007 (9th Cir. 2001), as amended (Aug. 15, 2001) (citation omitted). See also, e.g., Doran v. Salem Inn, Inc., 422 U.S. 922 (1975) (holding that bar owners had standing to challenge town's prohibition on topless waitresses). Regardless of the industry, however, a business "may properly assert its employees' or customers' First Amendment rights where the violation of those rights adversely affects the financial interests or patronage of the business." Hang On, Inc. v. City of Arlington, 65 F.3d 1248, 1251-53 (5th Cir. 1995).

### C. As the intended target of the challenged regulations, agricultural employers are presumed to have standing.

"[A] plaintiff is presumed to have constitutional standing to seek injunctive relief when it is the direct object of regulatory action challenged as unlawful." Nat'l Lifeline Ass'n v. Batjer, No. 21-15969, 2023 WL 1281676, at *2 (9th Cir. Jan. 31, 2023) (citing Haven Hospice v. Sebelius, 638 F.3d 644, 655 (9th Cir. 2011)). Where, as here, "the suit is one challenging the legality of government action or inaction," and the plaintiff is in the group targeted by the challenged action, then "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). No one disputes that the Act targets

agricultural employers—the Legislature specifically enacted the FLFLPA amendments to SERA for the purpose of regulating this industry. See, e.g., SERA § 702-b (titled "Impasse resolution procedures *for agricultural employers*" (emphasis added)). Absent injunctive relief, New York farms must comply with the Act under threat of criminal prosecution. See SERA § 709 (interfering with PERB's duties "shall be punished" with monetary penalties and "imprisonment for not more than one year."). And the voluminous record evidence confirms that the State has directly subjected all the Farm Plaintiffs to regulatory enforcement actions—including bargaining orders expressly premised on the card-check and compulsory unionization provisions of the Act. See, e.g., Comp., Ex. 13, 21.

### D. Employers have standing to challenge the constitutionality of PERB's administrative process.

The mere threat of protracted administrative proceedings premised on unconstitutional enforcement actions constitutes an independent justiciable injury. Axon Enter. v. Fed. Trade Comm'n, 143 S. Ct. 890 (2023). In Axon, respondents to an agency action alleged that various aspects of the agency's structure and procedures "violates the Constitution" such that "the violation made the entire proceeding unlawful," and that "being subjected to such an illegitimate proceeding causes legal injury." Id. at 898. The Supreme Court unanimously agreed that these parties had standing to bring their constitutional claims seeking "to enjoin [the agency's] proceedings" in federal district court—even before the agency issued a

final merits decision. Id. Although the statute contemplated post-decision judicial review of any agency decision, the Court reasoned that federal courts should exercise jurisdiction over such claims because the parties "will lose their rights not to undergo the complained-of agency proceedings if they cannot assert those rights until the proceedings are over." Id. at 904. Here, just like the Axon plaintiffs challenged the agency's inherent authority, New York farms assert that "the inherent operational structure of the PERB agency is unconstitutionally flawed" in multiple ways. Complaint ¶ 296. The district court did not address any aspect of this claim.

### E. The prudential third-party standing doctrine does not apply.

The typical rule against so-called third-party standing is "flexible and not jurisdictional in nature." American Iron & Steel Institute v. Occupational Safety & Health Administration, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999). Rather, it is a "prudential limitation" that "may be pretermitted in favor of a straightforward disposition on the merits." Secretary of State of Md. v. J. H. Munson Co., 467 U.S. 947, 956 n.5 (1984). Here, the claims that Appellants supposedly assert "on behalf of farmworkers" are grounded in the First Amendments rights of speech and association. Accordingly, the doctrine against third party standing does not apply. Id. at 956-57; Eisenstadt v. Baird, 405 U.S. 438, 446 n.5 (1972) ("in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely

because application of those rules would have an intolerable, inhibitory effect on freedom of speech").

Even if Appellants were asserting rights "on behalf of" farmworkers, Appellants' claims would be justiciable. Courts—including the district court here, albeit with no analysis—have recognized two exceptions to the prudential bar on so-called third-party standing. First, a party may assert the rights of a third party if they share a close relationship. See, e.g., Pierce v. Society of Sisters, 268 U.S. 510, 535 (1925) (school and parents); Craig v. Boren, 429 U.S. 190, 195 (1976) (bartender and customers). Second, a party may seek to redress the violations of a third party's rights when "practical obstacles prevent a party from asserting rights on its own behalf," especially when, as here, the plaintiffs and the third parties have disparate ability "to frame the issues and present them with the necessary adversarial zeal." J. H. Munson Co., 467 U.S. at 956; Barrows v. Jackson, 346 U.S. 249, 257 (1953).

The district court found that Appellants "do not have a sufficiently close relationship with farmworkers to raise constitutional claims on their behalf" because their interests were not "sufficiently aligned to make the employers as effective a proponent for the farmworkers' rights as the farmworkers themselves." Order, p. 5. Similarly, the district court erroneously concluded that no "obstacle exists to inhibit farmworkers from asserting these constitutional claims in state or federal court on

their own behalf." Id. In reaching these conclusions, the district court ignored the undisputed record evidence.

New York farm laborers—including the workers employed by the Farm Plaintiffs—have overwhelmingly expressed their desires to stop the State from imposing mandatory union membership and payment of union fees as a condition of employment. In fact, workers subjected to binding certification orders have repeatedly attempted to revoke their dues deduction cards, submit evidence that the union obtained their signatures under duress, testify at hearings, and even outright petition for decertification—all to no avail.

The evidence of these aligned interests—and the State's repeated obstruction of farmworkers' attempts to assert their rights—is plentiful. For instance, after learning that UFW was using their names to obtain union certification without their consent, more than 20 employees of Appellant Kirby Farms provided PERB with individualized handwritten statements explaining that they "do not want to be represented by any union." Dkt. 44-3, pp. 10-32. Similarly, dozens of Appellant Porpiglia's farmworkers asked the Agency to disregard any union card that UFW may have submitted in their name. See Dkt. 42-13, p. 8 (Agency acknowledging that it received 27 handwritten statements from Porpiglia workers stating that they are "not interested" in joining the union). In other words, these workers were attempting to exercise their constitutional "freedom not to associate" with the union. See

Roberts v. U.S. Jaycees, 468 U.S. 609, 623 (1984). Yet, PERB wholly disregarded these employees and rubber-stamped UFW's request to be designated their "exclusive representative." As PERB's guidance boldly confirms, "SERA and the FLFLPA do not provide for withdrawal or revocation of cards." Comp., Ex. 2, p. 3.

The Agency refuses to consider any evidence proffered by farmworkers. When multiple Crist Bros employees called PERB to complain about harassment from unwanted union organizers, the agency provided them with no remedy. See Dkt. 37-6, p. 2. The Agency even refuses to compare the signatures on the cards with signature exemplars provided by workers to address credible allegations of union organizers fraudulently signing cards on their behalf. Kirby Farms, 2023 WL 3071143 (denying Kirby's request for consideration of "signature exemplars to ascertain whether any signatures may have been forged by the UFW"). In their very first submissions to PERB, Farm Plaintiffs specifically advised they intended to present "[l]ive testimony of farm laborers regarding these issues, to be presented at a hearing," Dkt. 37-7, and "video testimony" from former workers who had already returned to their home countries. Dkt. 40-4, p. 77. The State never allowed those employees to testify, even though they would have been subject to questioning and presumably cross-examination, if the State had actually held hearings.

Even where "all" of a farm's employees "expressed their desire to decertify, PERB "denied [them] the opportunity to convey their position as to representation

in their native language," and instead "ignored them." Dkt. 53-18. These farmworkers then attempted to file a petition for decertification of their PERB-designated bargaining representative, but PERB refused to process their request because the Agency's decertification form only applies to public sector employees.[7] See Dkt. 53-15; 53-18.

The district court's unsupported contention that nothing "inhibit[s] farmworkers" from asserting their own constitutional claims is completely divorced from the circumstances of this case. Under the Act, farmworkers "are not parties to the [] process" and "have no opportunity to be heard at the time" that the State adjudicates their rights. Powers v. Ohio, 499 U.S. 400, 414-15 (1991) (noting these "considerable practical barriers" as relevant to holding that criminal defendants may assert the constitutional rights of potential jurors). The State is violating the rights of current and former H-2A workers who may not live in New York, much less the United States, and have no practical avenues to pursue their claims or even access American courts. In fact, many of the affected workers are not even identifiable and would not have standing to pursue their own claims because the State compels farms

---

[7] As the Agency's guidance confirms, "the statutes do not expressly provide for decertification" and PERB declined to "establish a process and procedure for decertification," even when asked to do so by interested parties. Comp., Ex. 2, p. 11. Private sector farmworkers are the only group that are denied the option to petition for decertification and thus compelled to associate and delegate their freedom of speech to unions—an inexplicable and unjustifiable reversal of the established constitutional rule that "the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign." Locurto v. Safir, 264 F.3d 154, 166 (2d Cir. 2001).

to bargain with unions over the rights of workers "before such workers are actually employed." See Kirby Farms, PERB ¶ 4402, 2023 WL 3071143 (2023).

## II.   Appellants appropriately assert pre-enforcement challenge SERA's compulsory arbitration scheme.

Appellants sought to enjoin enforcement of the Act's binding impasse scheme before facing the irreparable harm of being ordered to "arbitrate" with a labor union based upon a constitutionally questionable process and statute. See Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir.2003) (holding that "being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable" constitutes irreparable harm). In addition to challenging the lack of procedural due process provided by the Agency before granting the union's impasse petitions against the Farm Plaintiffs, Appellants set forth how the statute—both facially and as applied to Farm Plaintiffs—does not comport with the protections of the Equal Protection Clause and Due Process Clause. Furthermore, an order requiring assent to a contract would unquestionably violate the First Amendment both in compelling a communicative act and in violating the freedom of association. See Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 61 (2007) ("[F]reedom of speech prohibits the government from telling people what they must say."); Boy Scouts of America v. Dale, 530 U.S. 640, 648 (2000) ("Freedom of association … plainly presupposes a freedom not to associate.").

Although the district court did not properly address the merits of any of these claims or theories, the district court particularly strayed from established principles of federal court jurisdiction when it held that "Plaintiffs' equal protection claim of a class-of-one theory is not constitutionally ripe." (Order, p. 6). The district court's reasoning that the claims are not ripe because Appellants "have not yet been subject to compulsory impasse arbitration" cannot be reconciled with the established rule that a party does *not* need to subject themselves to further constitutional violations and risk further compliance costs and penalties in order to bring a pre-enforcement challenge to a state regulatory scheme. See Tweed-New Haven Airport Auth. v. Tong, 930 F.3d 65, 70-71 (2d Cir. 2019) ("The State claims that standing is not available under this theory because Connecticut has made no overt threat to enforce the Statute. Crediting this argument would run afoul of the Supreme Court's admonition not to put 'the challenger to the choice between abandoning his rights or risking prosecution.'").

Moreover, the district court's apparent skepticism regarding whether the statutory process "will result in different collective-bargaining agreements" imposed onto each agricultural employer ignores the entire purpose of the scheme. Under SERA § 702-b, the State-appointed arbitrator has broad discretion to issue a binding decree that will supersede generally applicable state law and govern all aspects of the employee-employer relationship. Crucially, however, the arbitrator's decree will

only apply to one specific farm—thereby arbitrarily burdening that farm with rules that do not apply to any other similarly situated farms. See SERA §702-b(3)(c) (detailing the arbitrator's "authority" over "all matters related to the dispute" between "the respective parties"). And when another farm is subject to the same compulsory arbitration process, the State will appoint a different "arbitrator" to issue a new binding decree. The regulations applicable to this second farm—which may include minimum wage and maximum hour standards, seniority rights, termination for cause provisions—will necessarily not be the same as the ones imposed on the first farm. Each compelled contract will be different because each arbitrator has complete discretion to "take into consideration" the vague enumerated factors in the statute and "any other relevant factors" based on the circumstances of the specific dispute between that one farm and that one labor union. SERA § 702-b(3)(c)(iii). By permitting an "arbitrator" to craft enforceable regulations on an individualized farm-by-farm basis, the Act expressly contemplates that similarly situated employers will each be in their own "class of one."

The district court effectively adopted the State's argument that enforcement of the statute remains speculative—a conclusion contradicted by both the record evidence and the express text of SERA § 702-b.  The Agency began the SERA § 702-b process against Appellants Kirby, Cahoon, Lynn-Ette, and Porpiglia when the Agency granted the Union's declaration of impasse and ordered the farms to attend

mandatory mediations with Agency mediators. Comp. ¶¶ 164, 188, 207, 247, 248, 334.[8]

But even without this record evidence, Appellants' claims are constitutionally ripe as a pre-enforcement challenge to the preordained outcome of the statutory scheme. To bring a pre-enforcement challenge, a plaintiff only needs to demonstrate an intention to engage in conduct "arguably affected with a constitutional interest," that "the intended conduct is 'proscribed by' the challenged law," and that "there exists a credible threat of prosecution" under the statute or regulation. Vitagliano v. Cnty. of Westchester, 71 F.4th 130, 136-37 (2d Cir. 2023) (quoting Driehaus, 573 U.S. at 159). The applicable standard "is quite forgiving to plaintiffs." Vitagliano, 71 F.4th at 138-39 (2d Cir. 2023).

Just last term, the Supreme Court reaffirmed this low threshold when holding that a plaintiff presented a ripe controversy based on "worries" regarding future enforcement. 303 Creative LLC v. Elenis, 600 U.S. 570 (2023). In 303 Creative, the Supreme Court affirmed the Tenth Circuit's conclusion that "this case is ripe" when the case involved a challenge to application of a state statute to a business owner

---

[8] Since the district court's order and before the filing of this brief, PERB has accepted the union's petitions for referral to arbitration against Kirby Farms, Cahoon, Porpiglia, and Lynn-Ette. In adherence to an agreement with opposing counsel regarding the briefing schedule in this case, Appellants have not moved for expedited or emergency relief from this Court, but Appellants reserved the right to do so if the Agency took further steps towards ordering binding arbitration. These individual parties, however, have asked PERB to stay the process pending the outcome of this appeal. PERB has not acted on that request.

who had never been subjected to enforcement actions by the state, several hypothetical steps remained in the process before the plaintiff would ever be subjected to any harm. See 303 Creative LLC v. Elenis, 6 F.4th 1160, 1175-76 (10th Cir. 2021). As lower courts have already recognized, 303 Creative "underscores the low threshold for establishing standing" in pre-enforcement claims. Planned Parenthood Great Nw. v. Labrador, 1:23-cv-00142-BLW, at *34 (D. Idaho July 31, 2023).

Similarly, here, New York agricultural employers do not have to wait until the State follows through with the sweeping imposition of individualized farm-by-farm labor contracts in order to bring constitutionally ripe claims contesting the validity of the statute and the State's intended enforcement actions. Indeed, the standard for both injunctive relief and standing purposes does "not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007). See also Mgmt., Inc. v. Equal Emp. Opportunity Comm'n, 70 F.4th 914, 919–31 (5th Cir. 2023) ("To begin, plaintiffs' claims are justiciable. Despite the EEOC's protestations that no one has brought a Title VII enforcement action against these plaintiffs, the plaintiffs have established a credible fear of such an action sufficient to establish standing. The case is ripe

because no further facts are required to adjudicate plaintiffs' specific claims, and there is a hardship to them in withholding judgment.").

## III. The district court's order cannot be affirmed because the court failed to articulate the basis for its denial of injunctive relief on multiple claims.

"In deciding whether to grant a preliminary injunction, a district court **must** consider whether the plaintiffs have demonstrated that they are likely to prevail on the merits." Ashcroft v. American Civil Liberties Union, 542 U.S. 656, 666 (2004) (emphasis added). Indeed, "[t]he Federal Rules of Civil Procedure provide that '[i]n granting or refusing an interlocutory injunction, the court must state the findings and conclusions that support its action'" Alleyne v. State, 516 F.3d 96, 101 (2d Cir. 2008) (citing Fed. R. Civ. P. 52(a)(2)). The court has a duty to both "find the facts specially" *and* "state is conclusions of law separately" on the record. Fed. R. Civ. P. 52(a).

The Second Circuit "ha[s] not hesitated, on numerous occasions" to overturn a preliminary injunction decision "for lack of adequate findings" Alleyne, 516 F.3d at 101 (holding that "[t]he district court did not sufficiently articulate its basis for enjoining Section (f)(4), precluding meaningful appellate review of the order"). See also, e.g., Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998) (vacating an order denying preliminary injunctive because "the district court made no findings" regarding "several controversies relevant to [the plaintiff-appellant's] preliminary injunction motion"); Naacp v. Town of New Haven, 70 F.3d 219, 223

31

(2d Cir. 1995) ("In the case at bar, the district court made no findings of fact whatsoever. Its denial of the preliminary injunction was driven only by a concern for public safety, and no findings on even that issue were made."). Notably, "whether a district court should have reached the merits of a requested injunction is a question of law" and "therefore entails de novo review." American Express Financial Advisors v. Thorley, 147 F.3d 229, 231 (2d Cir. 1998) (holding it improper for the district court to decline to consider likelihood of success on the merits, even though the parties' arbitration agreement provided that the ultimate final judgment on the merits would be made in arbitration).

Here, the district court denied the majority of Appellants' claims for injunctive relief in one conclusory sentence not supported by any citation: "Nor have Plaintiffs demonstrated irreparable harm absent an injunction regarding any remaining claims." See Order, p. 15.[9] These summarily denied "remaining claims" include:

1) Plaintiffs' procedural due process claim with respect to the bargaining and certification orders, including Plaintiffs' claims that they were

---

[9] The district court "incorporated" the "transcript from the hearing" into its decision. Order, p. 2. Due to the back-and-forth nature of the hearing, however, it is unclear which portions of the court's statements should be considered appealable findings. In any event, the scope of issues discussed at the hearing does not go much beyond the written order. Cf. Nielsen Consumer LLC v. The NPD Grp., No. 22-1206, at *4 n.2 (2d Cir. Oct. 14, 2022) ("The district court incorporated its reasoning from the preliminary injunction hearing into the order. . . . These statements, however, do not provide sufficient findings and conclusions to enable a meaningful review of the district court's decision.")

32

unconstitutionally denied notice and an opportunity to be heard (Count II of the Complaint);

2) Plaintiffs' Due Process Clause challenge to the structure and practices of PERB and the bias of its decisionmakers (Count III);

3) Plaintiffs' challenge to numerous parts of the statutory and regulatory scheme as unconstitutionally vague (Count IV);

4) Plaintiffs' challenge to the criminal provision of SERA (Count IV);

5) Plaintiffs' Fourteenth Amendment challenge to compulsory arbitration based upon <u>Wolff Packing Co. v. Indus. Court</u>, 262 U.S. 522 (1923) (Count V);

6) Plaintiffs' claim that SERA compels speech of *employers* in violation of the First Amendment by requiring them to negotiate and bargain with the union, and enter into a contract with the union (Count VII);

7) Plaintiffs' Contracts Clause claim (Count X); and

8) Plaintiffs' Takings Clause claim (Count XI).

Appellants expressly pled each of these bases for injunctive relief in their Complaint and Motion for Preliminary Injunction. Both Parties' briefs featured discussions of these claims. <u>See, e.g.</u>, Response Brief, Dkt. 35, p. 30 ("FLFLPA . . . Does Not Violate the Contracts Clause"); Id., p. 33 (referencing "the appropriate remedy for a Takings Clause claim"); Id., p. 47 n. 32 (responding to arguments

regarding SERA § 709).[10] Amicus NCAE devoted a full section of its brief to arguing how Appellants are entitled to injunctive relief on their Takings Clause claim. See Amicus Brief, Dkt. 102-2, pp. 16-18. Amicus Western Growers devoted over half of its brief to explaining why Wolff Packing, 262 U.S. 522 (1923), governs the compulsory impasse arbitration issue. See Amicus Brief, Dkt. 99, pp. 19-45. Neither the district court's 17-page order nor the "incorporated" hearing transcript explain why Appellees would not be entitled to a preliminary injunction on these claims.

The district court's one-sentence disposition of "remaining claims" cannot be affirmed. As this Court has held, "conclusory statements that plaintiffs are 'likely to suffer irreparable harm' and 'have a likelihood of success on the merits' are insufficient" to satisfy Rule 52(a)(2). Eyewonder v. Abraham, 293 F. App'x 818, 820 (2d Cir. 2008) (reversing an order that "cites the correct standard" but then reaches a conclusion "without discussion" because order does "not provide any basis on

---

[10] Despite raising merits-based defenses to both claims, Defendants-Appellees' Response Brief incorrectly asserted that "Plaintiffs do not rely on their Takings Clause claim in seeking preliminary relief" and "Plaintiffs' brief does not purport to rely on their Contracts Clause Claim." Dkt. 35, p. 33. The Motion for Preliminary Injunction, however, makes clear that Appellants moved for injunctive relief on *all* of their claims. See Dkt. 2, p. 2 ("As detailed in the accompanying Memorandum and Counts I through XI of the Verified Complaint, the Act and Defendants' related enforcement actions and threatened actions violate the Supremacy Clause, the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, the First Amendment, and the Takings Clause of the Constitution of the United States."). The Complaint itself expressly requests injunctive relief on the basis of each cause of action.

which the appellate court may assess whether the district court has properly exercised its discretion.").

Moreover, given that "[t]he denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the violation persists for 'minimal periods' of time," French, 985 F.3d at 184 (citation omitted), a court simply cannot reach a conclusion on irreparable harm without addressing the merits of a constitutional claim. The district court therefore erred by concluding that "Plaintiffs have not demonstrated irreparable harm regarding their remaining claims" (Order, p. 15) without ever addressing likelihood of success on the merits of those claims. Because "the irreparable harm inquiry [in constitutional cases] depends on the merits of the claims," the merits should be addressed first, and then the court should "consider irreparable injury at the end of our opinion." Hsu ex rel. Chin-Ching Hsu v. Roslyn Union Free School District No. 3, 85 F.3d 839, 853-54 (2d Cir. 1996). The district court misapplied the law when holding that it "need not address" certain claims because "there is no irreparable harm." Order, p. 15.

## IV. Appellants are likely to succeed on the merits of their due process and equal protection claims.

The Agency's enforcement process is rife with increasingly severe deprivations of liberty and property interests and no corresponding due process. The arbitrator "determination" contemplated by the statute shocks the conscience and

represents an unprecedented infringement on the fundamental rights of private sector employers.

### A. The State deprives private sector agricultural employers of numerous protected interests without sufficient process.

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." Reed v. Goertz, 598 U.S. 230, 236 (2023). As detailed in the Verified Complaint, the State has deprived—and further threatens to deprive—Appellants of numerous protected interests, including interests in operating their business, entering into contracts with other private parties, and freely speaking with their employees. Comp., ¶ 269-92. See Rice v. Vill. of Johnstown, 30 F.4th 584, 595 (6th Cir. 2022) ("A business owner can have a protected property interest in the continued operation of the business."); Nicholas v. Pennsylvania State University, 227 F.3d 133, 140 (3d Cir. 2000) ("The text of the Fourteenth Amendment speaks of 'property' without qualification, and it is well-settled that state-created property interests, including some contract rights, are entitled to protection under the procedural component of the Due Process Clause"); Chernin v. Lyng, 874 F.2d 501, 505 (8th Cir. 1989) ("The [Supreme] Court has continued to hold that both employees and employers have an interest in the employment relation protected from arbitrary government action by the Due Process Clause.").

36

Further, the State deprives farms of their property interest—including the most quintessential property interest: money. The FLFLPA compulsion regime results in decreased farm profit and revenue by imposing increased wage rates on specific farms with no comparable sanction to similarly situated farms, as well as increased compliance costs and legal fees. The statute expressly grants PERB the power to impose monetary sanctions on employers, including through remedies that include payment of back pay, SERA § 706, as well as a statutory requirement that farms pay for half the cost of the arbitration—despite farms never consenting to this arbitration. See SERA § 702-b.

Under the PERB regime, these core deprivations of liberty and property rights are adjudicated through administrative "proceedings" handled by one Agency bureaucrat with effectively unreviewable power to issue binding orders. See PERB Rule § 263.29 ("The certification issued by the hearing officer shall be final and binding and the obligation to bargain shall attach."); SERA § 702-b(3)(iv) ("the determination of the neutral arbitrator shall be final and binding upon the parties"); see also, e.g., Comp. ¶ ¶ 231-237 (describing how PERB "certified that [UFW] has been designated and selected by a majority of the employees" at Cahoon Farms without any factual support and on the basis of a "representation proceeding" that involved nothing more than a few email exchanges with the employer).

As set forth in the Verified Complaint, PERB engages in a practice or policy of repeatedly denying agricultural employers their rights to hearings, notice, cross-examination, and a host of other processes that the constitution compels. See United States v. James Daniel Good Real Property, 510 U.S. 43, 53 (1993) (noting "[t]he right to prior notice and a hearing" is "central to the Constitution's command of due process"); Waters v. Churchill, 511 U.S. 661, 669 (1994) (plurality opinion) ("we have often held some procedures—a particular allocation of the burden of proof, a particular quantum of proof, a particular type of appellate review, and so on—to be constitutionally required in proceedings that may penalize protected speech."); Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542 (1985) ("root requirement" of the Due Process Clause is that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest); Superintendent v. Hill, 472 U.S. 445, 455 (1985) (due process requires that findings be supported by evidence in the record).

Even when the complained-of deprivation is a lesser liberty or property interest, and even in administrative proceedings, the government must at least provide parties with fair procedures, an unbiased decision maker, a hearing, and a meaningful opportunity to respond. Memphis Light, Gas Water Div. v. Craft, 436 U.S. 1, 18 (1978) (hearing required before cutting off utility service); Wolff v. McDonnell, 418 U.S. 539, 557-558 (1974) (hearing required

before forfeiture of prisoner's goodtime credits); Goldberg v. Kelly, 397 U.S. 254, 264 (1970) (hearing required before termination of welfare benefits); Gibson v. Berryhill, 411 U.S. 564, 579 (1973) (stating principles of fairness are equally applicable to administrative as well as judicial proceedings).

The lack of due process provided to farm employers is particularly insufficient when considering the unilateral card-check certification system that PERB relies on to initiate enforcement actions. The Act's card-check process involves PERB designating a labor union as the "exclusive representative of all the employees" solely "on the basis of dues deduction authorizations" submitted by union organizers. SERA § 705(1). Employees cannot revoke their dues deduction cards except as permitted by the union, and employers likewise have no ability to challenge the authenticity of the union's purported dues deduction cards, no ability to present evidence to rebut the union's claim of majority support, and no opportunity to be heard before a neutral decisionmaker. Appellants Crist Bros, Kirby, and Porpiglia each submitted evidence that the union obtained card signatures through fraud and coercion. Comp., ¶¶ 98, 145; Comp, Ex. 6. Despite this evidence and the farms' express request for a hearing to present testimony from farmworkers, PERB declined to even investigate these credible claims of fraud. Comp., ¶¶ 144, 145, 147, 185.

Instead, if the Agency determines that the union submitted dues deduction authorization cards signed by the majority of employees, then the union obtains certification. Comp. ¶¶ 90–98, 110, 147, 149, 150, 185. <u>See also</u> Comp., Ex. 18, p. 40 (explaining how the Act precludes challenges to this determination, which PERB considers "a purely internal administrative matter for the hearing officer"). Incredibly, if an employer inadvertently misses a deadline or does not provide a sufficiently complete written response to the Agency's request for information, PERB actually absolves itself of any duty to even count the cards or calculate whether the cards support the union's claim of majority support. <u>See</u> <u>UFW v.</u> <u>Cahoon Farms</u>, CU-6729, 56 PERB ¶ 4409, 2023 WL 5949195 (August 3, 2023) ("To the extent that Cahoon Farms seeks to argue that . . . UFW would not have had sufficient dues deduction authorization cards to establish majority support, as explained above, the time to make this argument and provide supporting evidence has passed."). Similarly, PERB has never rejected a union's declaration of impasse or accepted evidence regarding whether an impasse actually exists before invoking the SERA § 702-b compulsory mediation and arbitration process against the employer. Comp., Ex. 14.

As soon as the State initiates an enforcement action, the State bears the burden of providing adequate procedural protections to the private party targeted by the action. New York does not do so. For instance, even though the filing of a union

petition against a farm can directly lead to severe irrevocable consequences for the farm—including a binding certification order and a compelled contract—the State provides no notice to farms as to the scope or gravity of the situation. Even worse, the "Notice of Petition" forms used by the Agency affirmatively misleads farms. The Notice form mailed—not personally served—to employers expressly contemplates a "hearing" and asks the employer to submit names of witnesses that will "testify" at the hearing—despite PERB thereafter denying them the right to present testimony or evidence at a hearing. See Comp, Ex. 4, 5. Moreover, each of the Notice forms sent to the Farm Plaintiffs here stated that "there is no question or controversy."

### B. The district court misapplied the procedural due process framework and failed to address the actual due process claims set forth in the Complaint.

Despite the Parties' respective briefs vigorously disputing whether the entire PERB administrative process comported with the constitutional notice and hearing prerequisites, the district court wholly ignored those issues and mischaracterized Appellants' procedural due process claims as limited to a facial attack on the "multi-step procedure" found in SERA § 702-b(1) and § 702-b(3). See Order, pp. 12-13. In reality, Appellants' procedural due process claims are based upon, among other things, the State's policy of denying due process to employers prosecuted by PERB, as well as the unconstitutional structure of the Agency and the lack of judicial review. The district court essentially dismissed the entirety of Counts II and III of

the Complaint by only taking a cursory glance at one part of the Act without addressing the actual facts pled by Appellants and supported by the record.

The district court's analysis incorrectly assumes: 1) that the only "deprivation" occurs at the end of the compulsory arbitration, when the contract is imposed—when, as detailed in the Complaint, employers are subject to numerous prior deprivations of liberty interests, including being compelled to respond to petitions, answer charges, ordered to bargain, and ordered to mediate; 2) that the "multi-step" procedure in SERA 702-b represents the only relevant process to be analyzed—as opposed to the process involved in first subjecting the employer to bargaining orders (the process set forth above); and 3) that the "multi-step procedure with abundant process" provides the *type* of *relevant* process that sufficiently protects the rights of *employers*. Contrary to the district court's ipse dixit conclusion, the multi-step process set forth in SERA 702-b is actually just a multi-step series of more and more egregious deprivations of employer rights, none of which are accompanied by pre-deprivation notice and the opportunity to be heard— the core procedural requirements relevant to satisfy the Due Process Clause. The district court conducted no analysis whatsoever of these issues.

### C. The structure of PERB does not comport with due process.

"[D]ue process does not permit the same individual to issue the initial decision finding violations and order[] remedies, participate personally in the prosecution of

the case … , and then make the final agency decision that will receive only deferential judicial review." Horne v. Polk, 242 Ariz. 226, 228 (2017). See also Withrow v. Larkin, 421 U.S. 35, 47 (1975). Here, PERB's inherent bias and lack of neutral decisionmaker represents serious due process violations—especially when balanced against the hardship faced by agricultural employers: indefinite union certifications, compelled bargaining, and state-drafted "arbitration awards" that can change every aspect of a farm's business and employment practices.

Until July 2023 and all times throughout the processing of the Farm Plaintiffs' matters until the respective Decisions, one individual—Sarah Coleman—held three positions concurrently: the agency's Acting Director, Deputy Chair of the Board, and Administrative Law Judge. Comp., Ex. 8. This co-mingling of investigative, prosecutorial, and adjudicative functions within the same agency is inherently egregious because one single individual performs all three functions. See Horne, 242 Ariz. At 228. As Deputy Chair, Coleman works hand in glove with the Board to set agency policy and even " draft[] Board decisions for review and adoption by the Board." [11] Where, as here, the same person who decided the case in the first instance may be the one who also writes the appellate-level decision, the right to appeal is illusory at best. This structure and function tainted the entire proceedings and renders the Orders issued—and which continue to be enforced—in the matters of Appellants

---

[11] See https://perb.ny.gov/office-of-the-chairman/.

Kirby, Porpiglia, and Lynn-Ette unconstitutional. Again, the district court did not acknowledge these issues in its analysis.

### D. The compulsory binding "arbitration" regime offends fundamental constitutional rights.

New York's FLFLPA implements a compulsory arbitration regime where the State vests a designated "arbitrator" with the power to impose rules and regulations that will have the force of law on only one employer. See SERA § 702-b. The State permits its arbitrator to impose substantive contractual terms on private parties. This unprecedented statutory scheme targets the State's agricultural employers and farm laborers in violation of settled constitutional law.

In three related cases, the Supreme Court unanimously held that a Kansas compulsory arbitration scheme analogous to the FLFLPA unconstitutionally infringes on the liberty and property interests of private employers. See Wolff Packing Co. v. Indus. Court, 262 U.S. 522 (1923); Dorchy v. Kansas, 264 U.S. 286 (1924); Wolff Packing Co. v. Indus. Court, 267 U.S. 552 (1925) (collectively, "Wolff"). These cases established the constitutional dividing line between mandatory collective bargaining and compulsory imposition of terms, which has guided American labor law ever since. See, e.g., NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45 (1937) (U.S. labor law "does not compel agreements between employers and employees," and "does not compel any agreement whatever"). The Wolff trilogy has never been overruled or questioned by the Supreme Court. Lower

courts must "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." <u>Rodriguez de Quijas v. Shearson/Am. Express, Inc.</u>, 490 U.S. 477, 484 (1989).[12]

Since <u>Wolff</u>, the constitutionality of a compulsory arbitration labor statute appears to only have reached the Supreme Court one other time—ironically, as part of a lawsuit brought by UFW, the very same union now relying on New York's anti-employer scheme to obtain compelled contracts from farms. <u>See</u> <u>Babbitt v. United Farm Workers</u>, 442 U.S. 289 (1979). UFW had challenged the constitutionality of an Arizona law that can best be described as a mirror image of the FLFLPA. Like New York's current law, the Arizona statute had mandated compulsory arbitration, albeit in a manner more favorable to the employer. Tellingly, the three-judge panel of the district court directly addressed the constitutionality of Arizona's law and unanimously held that "Such unilateral compulsory arbitration constitutes a clear denial of due process under the law for when the effect of statutes has been to coerce parties to submit to arbitration, without agreement or assent on their part to do so, the courts have declared them unconstitutional as depriving parties of liberty and property without due process of law or as depriving parties of constitutional right to a trial by jury." <u>United Farm Workers Nat. Union v. Babbitt</u>, 449 F. Supp. 449, 466

---

[12] <u>See also</u> David A. Schwarz, *Compelled Consent: Wolff Packing and the Constitutionality of Compulsory Arbitration*, N.Y.U, Journal of Law & Liberty, Vol. 12:24, 15-123 (2018), available at: https://tinyurl.com/2k8ptsmv.

(D. Ariz. 1978), rev'd, 442 U.S. 289 (1979) (citing  Dorchy v. Kansas, 264 U.S. 286 (1924); Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522 (1923); and Graves v. Northern P. R. Co., 5 Mont. 556, 6 P. 16 (1885)).

The Supreme Court ultimately reversed that decision and held that—due to circumstances not present here—"any ruling on the compulsory arbitration provision would be wholly advisory." Babbitt, 442 U.S. at 305. In doing so, the Court declined to opine on the merits of the issue. Thus, although the Arizona District Court's decision admittedly is no longer good law, it was not reversed on the merits but on a separate jurisdictional issue—and, crucially, the Arizona decision appears to be the only time since Wolff that a federal court has addressed the constitutionality of a compelled arbitration statute in the labor relations context. In other words, the only federal courts—other than the district court below—to have reached the issue agreed with Appellants that compulsory arbitration cannot survive constitutional scrutiny.

Compulsory arbitration statutes enacted in other contexts—applicable in much narrower circumstances, with much less at stake, and with greater checks on the arbitrator's authority—have likewise been struck down. See Bayscene Resident Negotiators v. Bayscene Mobilehome Park, 15 Cal.App.4th 119 (1993) (striking down on due process grounds a city ordinance which required binding arbitration for rent disputes); Smith Case, 381 Pa. 223, 230 (Pa. 1955) ("Indeed compulsory arbitration conflicts also with the 14th Amendment of the Federal Constitution in

that it works a deprivation of property and liberty of contract without due process of law."); <u>Mengel v. Nashville Paper Prod</u>, 221 F.2d 644, 647 (6th Cir. 1955) ("Compulsory arbitration, without right to have the issue determined by court action, is invalid.").

Here, SERA § 702-b similarly must be enjoined. Under New York law, the arbitration decision will necessarily compel the employer to change its workplace rules, employment practices, business practices, and any number of unspecified issues that implicate a host of liberty and property interests protected by the Due Process Clause.

Among other due process problems, SERA's compulsion regime declines to limit the scope of "matters in dispute" that the arbitrator can determine; the State delegates its adjudicatory and legislative power to one arbitrator (as opposed to the more standard three-arbitrator panel, or, as more typical when making such consequential determinations, a jury); and the statute has no binding standards. The Section 702-b enumerated factors are merely for the arbitrator to "take into consideration," and the arbitrator is permitted to consider "any other relevant factors." The compulsion regime gives the arbitrator complete freedom to assign whatever weight—or none at all—to any factor. <u>See</u> <u>Holmes v. N.Y. City Hous. Auth.</u>, 398 F.2d 262, 265 (2d Cir. 1968) (holding lack of "ascertainable standards" for denial in housing applications violative of due process); <u>White v. Roughton</u>, 530

F.2d 750, 753-54 (7th Cir. 1976) ("[A] procedure, vesting virtually unfettered discretion in [the Administrator] and his staff, is clearly violative of due process.").

In their briefs below, Appellees argued that the delegation of this quasi-legislative power to a single arbitrator remained constitutional because of "the availability of CPLR Article 75, which expressly authorizes judicial review of arbitration decisions." Dkt. 35, p. 39.[13] Article 75, however, incorporates an FAA-esque standard of review to arbitral awards—a standard of review described by circuit courts as "among the narrowest known to the law." Warrior Met Coal Mining v. United Mine Workers of Am., 2022 WL 656118, at *4 (11th Cir. Mar. 4, 2022). Indeed, this highly deferential review is premised on the fact that parties voluntarily agreed to waive their constitutional rights and subject their dispute to binding arbitration—circumstances far removed from the compulsory, non-contractual "arbitration" at issue here. See Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co., 2019 WL 1349527, at *2 (S.D.N.Y. Mar. 26, 2019) (cleaned up) ("deferential standard of review is appropriate in the context of arbitral awards to encourage and support the use of arbitration by consenting parties."); Starr Indem. & Liab. Co. v. G&G Underwriters, 19-cv-7835 (AJN), at *2 n.1 (S.D.N.Y. Aug. 9,

---

[13] The Act actually only provides for judicial review of "the determination of the public arbitration panel." SERA §702-b. The bizarre reference to a "public panel" could be read to preclude any judicial review of agricultural employer orders, which are rendered by one single arbitrator. Although perhaps a result of sloppy drafting, this provision further illustrates how private sector farms are provided even less due process than public employees.

48

2021) ("there is essentially no difference in the high bar a petitioner must surmount to vacate an arbitration award under New York law [compared to the FAA]"). Here, by contrast, the State seeks to impose substantive contract terms on private parties who never agreed to arbitrate nor consented to any waiver of constitutional rights.

Furthermore, SERA Section 702-b runs afoul of the fundamental principle that laws and regulations should apply generally to all members of society, thereby violating the Equal Protection Clause. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (ruling that laws and regulations that arbitrarily burden individuals as individuals are impermissible "class-of-one" laws that violate the Constitution's equal protection guarantees). To the extent the State may have a cognizable interest in subjecting the agricultural community to these targeted regulations, which do not apply to any other private sector industry, the State does not—and cannot—justify disparate treatment *within* this class of agricultural employers. And the impasse arbitration provisions do just that.

In enacting the SERA arbitration scheme, the State provided private agricultural employers even less due process protections than it provides to public sector employers who have long been subject to impasse arbitration. See N.Y. Comp. Codes R. & Regs. Tit. 4, §§ 205.3; 205.7; 209.4. In fact, nearly every other impasse arbitration statute includes significant more procedural safeguards than

New York's law—and those other statutes only apply to the public sector, where the government acts as the employer and has a *lesser* constitutional burden.[14]

When combined with the ad hoc card-check process, the lack of decertification options, and SERA § 704's announcement that employment can be conditioned on union membership, the compulsory arbitration scheme's disparate treatment of agricultural employers and of individual farms directly implicates fundamental rights, including First Amendment rights, and must be subjected to strict scrutiny. See Janus, 138 S. Ct. at 2448; Jones & Laughlin, 301 U.S. at 33 (right to freely select labor representatives is a "fundamental right"). In fact, "the Second Circuit held that 'a specific deprivation of [plaintiff's] opportunity to seek employment caused by a statutory impediment established by the state' supported a substantive due process claim." Hund, 501 F. Supp. 3d at 203 (quoting Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir. 1994)).

What is more, there can be no rational basis for individualized rulemaking proceedings in the legislature's cited goal of bettering working conditions for agricultural employees. Surely such concerns could justify *generally applicable regulation* tailored for the agricultural industry. But, generalized concerns justify only generalized regulation—not special directives targeted upon a single employer.

---

[14] Philip Rosen and Richard Greenberg, *Constitutional Viability of the Employee Free Choice Acts's Interest Arbitration Provision*, Hofstra Labor and Employment L. J.: Vol. 26: Iss. 1, Article 13 (2008), available at: http://scholarlycommons.law.hofstra.edu/hlelj/vol26/iss1/13

See Lazy Ranch Ltd. v. Behrens, 546 F.3d 580, 590 (9th Cir. 2008) (holding that although "administrative costs might be a valid reason to deny a bidder a lease, it simply does not offer a basis for treating conservationists different from other bidders.").

Here, the process is necessarily arbitrary because the State is not the one directly making the choice of which farms to target—rather, by design, the State wholly delegated that power to private labor unions. Only the farms targeted by labor unions will have these compelled contracts imposed on them. Thus, the state cannot claim that there are any standards—much less rational, non-arbitrary standards required by the Constitution—by which it decides which farms will be subjected to a compelled contract. Any attempt by the state to articulate a rational legitimate basis as to which farms are singled out must fail per se because the state has intentionally absolved itself of that task. In other words, the initial determination of which farms will be subjected to the scheme is arbitrary as a matter of fact because the FLFLPA precludes the state from having a determination; labor unions decide. Crucially, however, once labor unions decide to target a farm, the farm is subject to state action in the form of government-imposed and government-enforced edicts.

Finally, the fact that a labor union wishes to force a specific business to abide by heightened legal standards to advance its economic interests is an insufficient basis for imposing special legal requirements upon the targeted business. See St.

Joseph Abbey v. Castille, 712 F.3d 215, 222-23 (5th Cir. 2013) (holding that regulation serving no purpose but "economic protectionism" or "favoritism" cannot survive rational basis review); Merrifield v. Lockyer, 547 F.3d 978, 991 n.15 (2008); Craigmiles v. Giles, 312 F.3d 220 (6th Cir. 2002). The New York Legislature has already weighed competing social and economic considerations in saying what wages are owed and in dictating working conditions as a matter of general law.

## V. Appellants have demonstrated irreparable harm and likelihood of success on the merits of their H-2A preemption claim.

The district court declined to consider Appellants' claim that the Act's applicability to H-2A workers is preempted by federal law. The court held that "there is no irreparable harm currently facing Plaintiffs regarding their purportedly conflicting obligations related to H-2A workers" because, as the court reasoned, "Several steps remain in the statutory process before Plaintiffs would be subject to the proposed term regarding H-2A workers."

To the extent such contingencies may exist before Appellants are subject to an unconstitutional order, that cannot defeat Appellants' claim. To the contrary, "caselaw indicates that adjudicating whether federal law would allow an enforcement action might require courts to adjudicate hypothetical situations." Braidwood, 70 F.4th at 929 (internal quotations omitted). In Braidwood, even though plaintiffs had not been subject to an EEOC enforcement action and several steps remained in the process, plaintiffs were permitted to the merits of their

Declaratory Judgment Act pre-enforcement challenge to EEOC guidance documents because, among other reasons "the EEOC refuses to declare affirmatively that it will not enforce Title VII against the plaintiffs." Id. at 927. Here, not only has PERB refused to limit the Act's applicability to H-2A workers and employers, but the Agency actually continued to process union petitions and unfair labor charges that cannot be enforced against employers consistent with federal immigration law. See Comp., Ex. 16; Dkt. 51-12, pp. 2-3; Dkt. 94, p. 14.

The district court's analysis mischaracterized Appellants' preemption claim. For instance, the court stated that Appellants' argument regarding H-2A preemption was "not [based] on any specific provision in the statute." Order, p. 15. But Appellants' Reply Brief sets forth—in support of the preemption argument—how "even if New York farms have not yet been ordered to reinstate an ineligible H 2A worker, the statute expressly contemplates that the State will do so." Dkt. 94, p. 21 (citing SERA § 706(3)(c)). In other words, the claim is in fact based on a "specific provision of the statute." And in addition to challenging SERA's reinstatement remedy as applied to H-2A workers, Appellants bring their preemption claim on the basis of multiple binding PERB decisions applying the Act to H-2A workers. See Complaint, ¶¶ 253-264.

The district court misunderstood the nature of the H-2A claim when stating that Appellants' argument was only "based on a term in a proposed collective

bargaining agreement." Order, p. 15. Appellants did not rely on "a term" but rather on dozens of proposed terms that were presented to multiple farms. <u>See</u> Dkt. 2-1, p. 5. PERB officials also threatened that these proposed terms could be imposed on the Farm Plaintiffs through the statutory impasse arbitration procedure. <u>See</u> Complaint, ¶ 174. Because the statute does not meaningfully cabin the scope, timing, or application of the arbitrator's unilateral decree—and PERB has likewise refused to promulgate regulations to that effect—the possibility of employers being subject to those sorts of terms is far from hypothetical. As the United States acknowledged in its Statement of Interest, "[t]here may be potential outcomes of a collective bargaining process that could conflict with the H-2A Program requirements[.]" Dkt. 79, p. 9. Finally, the Agency continues to prosecute unfair labor charges based upon theories and remedies that likewise cannot be reconciled with H-2A regulations. <u>See</u> Complaint, ¶ 166-173. Based on these arguments (and the additional grounds set forth in the Complaint), Appellants moved to enjoin application of the Act to H-2A workers as violative of the Supremacy Clause. The district court's holding regarding this claim was expressly premised on clearly mistaken characterization of Appellant's arguments.

Finally, the lower court's holding on this issue cannot be reconciled with the court's concurrent holding that the H-2A preemption claim is ripe. The court correctly found that this pre-enforcement claim was ripe but neglected to assess the

merits despite the rule that irreparable harm is presumed if likelihood of success on a constitutional claim is established.

## VI. <u>Remand is not necessary because the Court has full discretion to grant injunctive relief based upon the district court record.</u>

Once a likely constitutional violation has been shown, the Court's "equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." <u>Hutto v. Finney</u>, 437 U.S. 678, 688 n.9 (1978) (citation omitted). It is "entirely appropriate" for courts "to bring an ongoing violation to an immediate halt." <u>Id.</u> Courts "may not deny a preliminary injunction motion and thereby 'allow constitutional violations to continue simply because a remedy would involve intrusion into' an agency's administration of state law." <u>Baird</u>, 2023 WL 5763345, at *3 (quoting <u>Brown v. Plata</u>, 563 U.S. 493, 511 (2011)). Here, the Court is well within its discretion to review the record, correct the district court's errors, and grant the relief requested in Appellants' Motion for Preliminary Injunction. <u>See San Filippo v. United Bro. of Carpenters</u>, 525 F.2d 508, 511 (2d Cir. 1975) ("Since the court rendered its decision on the pleadings and affidavits before it without a hearing, this Court is in as good a position as the district court to read and interpret those documents. Consequently, this Court is able to exercise its discretion and to review the papers de novo.").

## **CONCLUSION**

For the above reasons, as well as the numerous grounds set forth in the Verified Complaint and Plaintiffs' briefs to the district court, this Court should vacate and reverse the district court's denial of preliminary injunctive relief, and this Court should grant the injunctive relief requested by Appellants.

Respectfully submitted, this <u>30th</u> day of May, 2024,

*/s/Joshua H. Viau*
Joshua H. Viau
Boris Gautier
FISHER & PHILLIPS LLP
1230 Peachtree Street, NE
Suite 3300
Atlanta, Georgia 30309
(404) 231-1400
jviau@fisherphillips.com
bgautier@fisherphillips.com

Scott Allen, Jr.
LIPPES MATHIAS LLP
50 Fountain Plaza
Suite 1700
Buffalo, NY 14202
(716) 853-5100
sallen@lippes.com

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i), as extended by Local Rule 32.1(a)(4)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains less than 14,000 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt Times New Roman font.

*/s/Joshua H. Viau*
Joshua H. Viau

*Counsel for Appellants*

## <u>**PROOF OF SERVICE**</u>

I hereby certify that on May 30, 2024, I electronically filed the foregoing with the Clerk of Court using the ACMS system, which will send notice of the foregoing to all counsel of record.

*/s/Joshua H. Viau*

Joshua H. Viau

*Counsel for Appellants*